**CITIZENS INSURANCE COMPANY OF AMERICA, a Michigan corporation, Subrogee of the Koeze Company, a Michigan corporation, Plaintiff,**

v.

**PROCTOR & SCHWARTZ, INC., a Delaware corporation, Defendant.**

**No. 1:90–CV–837.**

United States District Court, W.D. Michigan, S.D.

Sept. 2, 1992.

Michelle F. Kitch, Denenberg, Tuffley & Jamieson, P.C., Grand Rapids, Mich., for plaintiff.

Thomas M. Weibel, Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for defendant.

## OPINION OF THE COURT

McKEAGUE, District Judge.

This case presents claims in contract and tort to recover damages for property damage and economic loss caused by fire. Now before the Court is defendant's motion for summary judgment, asking the Court to dismiss all claims.

### I. FACTS

In late 1976 or early 1977, the Koeze Company entered into a sales agreement with defendant Proctor & Schwartz, Inc., to purchase a peanut roaster and conveyor cleaner manufactured by Proctor & Schwartz. The peanut roaster and conveyor cleaner were delivered and placed into operation shortly thereafter and apparently performed satisfactorily until September 1, 1989, when the roaster caught fire. The fire caused substantial damage to the roaster and cleaner, as well as other property owned by Koeze Company. Koeze Company filed a claim with Citizens Insurance Company of America ("Citizens") for insurance benefits, which were paid, in the amount of $754,918.47. Citizens, as subrogee of the Koeze Company, seeks recovery of this full amount, alleging Proctor & Schwartz breached expressed and implied warranties and is guilty of negligence. Proctor & Schwartz contends all claims are barred as a matter of law and moves for summary judgment.

### II. SUMMARY JUDGMENT STANDARD

■ Defendant's motion for summary judgment asks the Court to evaluate the factual support for Citizens' claims. The Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, 477 U.S. at 247–248, 106 S.Ct. at 2510. (emphasis in original). If the movant carries its burden of showing there is an absence of evidence to support a claim or defense, then the opponent must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could find for the opponent. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantial law. *Id.* A complete failure of proof concerning an essential element of a claim or defense necessarily renders all other facts immaterial. *Celotex, supra*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

### III. BREACH OF EXPRESS WARRANTY

■ To the extent Citizens' claims are premised upon express warranties contained in the sales agreement, defendant contends they are barred by the applicable period of limitation. The sales agreement is a contract for the sale of goods, interpretation and enforcement of which is governed by Article II of the Uniform Commercial Code ("UCC"), codified in Michigan at M.C.L. § 440.2101 *et seq.* The applicable period of limitation under the UCC is defined as follows:

(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement *the parties may reduce the period of limi-*

*tation to not less than 1 year* but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery. of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

M.C.L. § 440.2725 (emphasis added).

First, with reference to subsection (1) above, defendant contends the parties did agree to reduce the period of limitation to one year. Indeed, the sales agreement at page 14, ¶ 10 provides:

> Any action against the Company for breach of this Agreement or of any guarantee or warranty granted herein by the Company must be commenced within 12 months of the date of the occurrence of such breach.

Second, with reference to subsection (2), defendant contends the sales agreement contains no explicit warranty as to future performance. Hence, it is argued,· any breach of warranty must be deemed to have occurred when the peanut roaster and conveyor cleaner were delivered to Koeze Company in late 1976 or early 1977. This action, commenced more than 13 years later, is said to be barred by the agreed to one-year period of limitation, as construed under the UCC.

Citizens argues the UCC is not applicable to define "occurrence of the breach" because it is not expressly incorporated or referred to in the sales agreement. The law of the state is clearly binding upon parties within its terms, however, regardless of whether they expressly recognize or incorporate it into a contract. Article II of the UCC "applies to transactions in goods." M.C.L. § 440.2101. The provisions of the UCC are to be liberally construed and applied to promote its purpose of simplifying, clarifying, and making uniform the law of commercial transactions. M.C.L. § 440.-1102(1). Subject to express limitations, the effect of UCC provisions may be varied by agreement of the parties. M.C.L. § 440.-1102(3). The parties did not agree to vary the UCC's definition of "occurrence of the breach." It follows, therefore, that the ·UCC definition applies to the contract.

Citizens next contends that if the UCC definition of "occurrence of the breach" applies to the contractual period of limitation, then a second provision of the contract will have been rendered illusory or at least ambiguous. The agreement provides, at page 12, ¶ 2(a):

> The Company warrants the Equipment against defects in materials and workmanship for a period of twelve months from the date of tender of delivery of the Equipment.

This provision, read in conjunction with the period of limitation provisions contained at page 14, ¶ 10, as it might reasonably be construed absent the above UCC definitional assistance, seems to indicate that a claim for breach of express warranty could be brought as late, theoretically, as 24 months after delivery if a defect in materials or workmanship occurred, or became manifest, on the last day of. the warranty period.

Still, this case does not present a claim for breach of express warranty occurring within 24 months after delivery. If it did, Citizens' argument would have *some* persuasive strength. But where reading the subject contract provisions in the light most favorable to Citizens serves merely to create a limitation period which expired almost eleven years prior to the alleged occurrence, the asserted potential ambiguity is purely technical and militates vainly against the overarching purposes of the UCC. ·

The Court concludes the contractual period of limitation should be construed under the governing UCC provision, M.C.L. § 440.2725. It follows that Citizens' claims for breach of express warranty are barred as untimely. Defendant is entitled to summary judgment as to claims for breach of express warranty contained in Count I of the second amended complaint.

## IV. BREACH OF IMPLIED WARRANTIES

■ Defendant contends any claim for breach of implied warranty should also be dismissed because such warranties were expressly disclaimed in the sales agreement. Defendant refers to the disclaimer contained at ¶ 2(b) on page 12 of the sales agreement:

EXCLUSION OF WARRANTIES. WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE, ARE SPECIFICALLY EXCLUDED, AND THERE ARE NO WARRANTIES EXPRESSED OR IMPLIED WHICH EXTEND BEYOND THE DESCRIPTION OF THE EQUIPMENT CONTAINED IN THIS AGREEMENT UNLESS THE WORD "GUARANTEE" OR "WARRANTY" IS USED IN CONNECTION THEREWITH.

The above language appears in contrasting capitalized, boldface print under the paragraph heading "WARRANTIES AND LIABILITY OF COMPANY." The language is conspicuous[1] and otherwise satisfies the UCC disclaimer requirements set forth at M.C.L. § 440.2316(2):

[T]o exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness, the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

The Court is satisfied that defendant Proctor & Schwartz effectively disclaimed the implied warranties of merchantability and fitness recognized under the UCC. See

*U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 509 F.2d 1043, 1046–47 (6th Cir.1975) (holding similar language to be a valid disclaimer).

■ Citizens argues such disclaimer is not effective, however, with respect to implied warranty in tort. Michigan case law provides substantial, if not conclusive, support for this proposition. In *Blanchard v. Monical Machinery Co.*, 84 Mich.App. 279, 283–85, 269 N.W.2d 564 (1978), the Michigan Court of Appeals recognized that, notwithstanding the similarity of labels, a claim for breach of implied warranty under the UCC is a fundamentally different remedy than a claim for breach of implied warranty in tort:

[T]he designation of the sale in the within case as being on an "as is" basis, does not relieve defendant seller of his duty of care. While disclaimers are generally not favored, the Uniform Commercial Code, recognizing that they have some utility in promoting free commerce, provides for such disclaimers in limited circumstances. However, whatever the impact of the UCC warranties and disclaimer attempted by defendant seller in the within case, it does not result in relieving defendant seller of his duty of care to plaintiff under the common law. Common law tort liability in Michigan is distinct from the warranty liabilities imposed by the Uniform Commercial Code, and *may not* be abrogated by the disclaimers permitted under the code.

(Emphasis added; footnotes omitted). The "implied warranty" in tort arises by operation of law, not as a function of the language of or other circumstances surrounding the agreement of the parties. *Id.* It imposes upon the manufacturer, wholesaler or retailer of goods the duty to avoid negligent conduct and to observe the standards of a reasonably prudent seller under the existing circumstances. *Id. Blanchard*

---

**1.** "Conspicuous" is defined by the UCC as follows:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: non-negotiable bill of lading) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

M.C.L. § 440.1201(10).

holds that such duty is not effectively disclaimed by the seller's designation that a product is sold "as is." Accord, *Wessels v. E.W. Bliss Co., Inc.*, 180 Mich.App. 440, 445, 447 N.W.2d 758 (1989); *Johnson v. Purex Corp.*, 128 Mich.App. 736, 740, 341 N.W.2d 198 (1983), *lv. denied*, 419 Mich. 901 (1984); *Dalton v. Saber Mfg. Co.*, Michigan Court of Appeals' unpublished opinion, docket no. 122644, dated April 25, 1991.

 The Court does not read *Blanchard* and its progeny as prohibiting disclaimer of the common law implied warranty *per se*. *Blanchard* appears to hold merely that what is effective to disclaim implied warranties recognized under the UCC "may not" be effective to disclaim the implied warranty born of common law. Similarly, an "as is" disclaimer was held in *Wessels, supra*, to "not necessarily" foreclose liability derived from common-law implied warranty. The language of these rulings implies that disclaimer of tort liability can be a legitimate part of a bargain, but must be clear, specific and conspicuous. Indeed, in an analogous context, the Michigan Court of Appeals confirmed that liability for negligence can be contractually disclaimed, holding that "in order for a party to disclaim liability for its own negligence, the contract must contain a clear and unequivocal expression of such intent." *American Empire Ins. Co. v. Koenig Fuel & Supply Co.*, 113 Mich.App. 496, 499, 317 N.W.2d 335 (1982).

The instant "exclusion of warranties" provision, despite its facial breadth, is not so clear, unambiguous and explicit as to put the reader on notice that the seller intended to disclaim common law tort liability for injuries caused by its negligence. The provision purports to exclude all warranties which might arise by implication from language of the agreement or from course of dealing or usage of trade. It makes no mention of common law implied warranty or other tort liability. Under the cited Michigan authorities, the provision cannot be deemed to effectively exclude common law implied warranty liability. To the extent defendant's motion seeks summary judgment on Citizens' implied warranty in tort claim based on the contractual exclusion of warranties, it must be denied.

## V. ECONOMIC LOSS DOCTRINE

Apart from whether defendant Proctor & Schwartz effectively disclaimed implied warranty liability in tort, it contends recovery in tort is barred under the circumstances by the "economic loss doctrine." "The economic loss doctrine is a judicially created doctrine that bars all tort remedies where the suit is between an aggrieved buyer and a nonperformance seller, the injury consists of damage to the goods themselves, and the only losses alleged are economic." *Sullivan Industries, Inc. v. Double Seal Glass Co., Inc.*, 192 Mich.App. 333, 339, 480 N.W.2d 623 (1991). In explaining the rationale for the doctrine, the *Sullivan* court borrowed the words of Dean Page Keeton, quoted in *Mid–Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308, 312 (Tex.1978):

"A distinction should be made between the type of 'dangerous condition' that causes damage only to the product itself and the type that is dangerous to other property or persons. A hazardous product that has harmed something or someone can be labeled as part of the accident problem; tort law seeks to protect against this type of harm through allocation of risk. In contrast, a damaging event that harms only the product should be treated as irrelevant to policy considerations directing liability placement in tort. Consequently, if a defect causes damage limited solely to the property, recovery should be available, if at all, on a contract-warranty theory."

192 Mich.App. at 340, 480 N.W.2d 623.

Citizens contends the doctrine has no application because the complained of defect resulted in substantial damage to property other than the peanut roaster and conveyor cleaner. Defendant maintains that inasmuch as the sales agreement was reached in a commercial setting, the alleged defect resulted in no personal injury, and the damage caused by the fire was entirely economic loss, Citizens' contract remedies are exclusive.

The scope of the economic loss doctrine was, in relevant part, recently given somewhat clearer definition by the Michigan Supreme Court in *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 486 N.W.2d 612 (1992). At issue was whether injuries to dairy cattle caused by a defective milking system constituted damage to "other property" outside the economic loss doctrine and were therefore actionable in tort. The court held the "proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of the damages." *Id.*, at p. 531, 486 N.W.2d 612.

> In many cases, failure of the product to perform as expected will necessarily cause damage to other property; such damage is often not beyond the contemplation of the parties to the agreement. Damage to property, where it is the result of a commercial transaction otherwise within the ambit of the UCC, should not preclude application of the economic loss doctrine where such property damage necessarily results from the delivery of a product of poor quality.

*Id.*, at p. 531, 486 N.W.2d 612 (footnotes omitted). The court went on to hold that injuries to dairy cattle caused by the defective milking system, though technically injuries to "other property," nonetheless constituted "economic loss," recovery of which in tort was barred by the economic loss doctrine, because the injuries were necessarily caused by the milking system defect.

The *Neibarger* court thus recognized as critical the distinction between "disappointment" and "disaster." *Id.*, at p. 524, 486 N.W.2d 612, quoting from *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1376 (9th Cir.1978). Where economic loss and even other property damage is a natural, foreseeable result of the product's defect, the "disappointed" commercial buyer is limited to his contract remedies. See e.g., *Sullivan, supra* (defective window sealant permitted penetration of moisture, resulting in fogging of window units and loss of insulating characteristics, necessitating replacement of window units); *Chicago Heights Venture v. Dynamit Nobel of America, Inc.*, 782 F.2d 723, 729 (7th Cir.1986) (leaking roofing materials resulted in deterioration of surrounding parts of structure). However, where a product's defect results in a sudden calamitous event causing damage to other property, then a "disaster," remediable in tort has occurred. See, e.g., *Star Furniture Co. v. Pulaski Furniture Co.*, 171 W.Va. 79, 297 S.E.2d 854 (1982) (clock wiring malfunction caused a fire resulting in other property damage).

Applying this distinction to the instant case, it is clear that Citizens complains of damage that was not only sustained by property other than the defective product, but that was caused by a sudden calamitous event.[2] Such damages are the result not of disappointment with machinery that performed unsatisfactorily, but of a disaster, the fire, allegedly caused by the defective product. Viewing the facts in the light most favorable to the nonmoving party, and considering, pursuant to *Neibarger*, "the underlying policies of tort and contract law as well as the nature of the damages," it appears the losses caused by fire damage to property other than the defective product, are of the sort traditionally remediable in tort. Even though they are "economic losses," in the sense that they are assigned monetary values, they are not the sort of usual commercial losses that should naturally have been within the parties' contractual contemplation and that would therefore be remediable exclusively in contract. See *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 574 (7th Cir.1990) (noting confusion inherent in the term "economic loss"), quoted in *Neibarger*, 439 Mich. at pp. 523–24, 486 N.W.2d 612. They are not the sort of economic losses which "necessarily result from the delivery of a product of poor quality." *Id.*, p. 531, 486 N.W.2d 612. Recovery of such losses in tort is not barred by the economic loss doctrine.

---

**2.** The Koeze Company damages are enumerated by Citizens as follows: (a) stock loss—$33,625.86; (b) extra expenses—$186,841.00; (c) building damages—$102,099.15; (d) personal property loss, including but not limited to the nutroaster—$399,478.06; and (e) recent extra expense payment—$32,874.40.

Remaining is the question whether the economic loss doctrine nevertheless operates to bar recovery in tort for fire damage to the product itself.[3] The *Neibarger* court left this question unanswered, observing that other courts have reached differing conclusions:

> At one end of the spectrum, the economic loss doctrine has been interpreted as permitting recovery in tort for injury to property other than the defective product itself. *Nat'l Union Fire Ins. Co. v. Pratt & Whitney*, 107 Nev. 535, 815 P.2d 601 (1991); *Kershaw Co. Bd. of Ed. v. U.S. Gypsum Co.*, 302 S.C. 390, 396 S.E.2d 369 (1990). Other courts have allowed tort recovery for physical damage to the product itself caused by a defect which is not merely a "disappointment," but also a safety hazard, *Russell v. Ford Motor Co.*, 281 Ore. 587, 575 P.2d 1383 (1978), or which results from a "calamitous" event. *Star Furniture Co. v. Pulaski Furniture Co.*, 171 W.Va. 79, 297 S.E.2d 854 (1982).

In this diversity case, the Court must apply state law in accordance with the controlling decisions of the Michigan Supreme Court. *Monette v. Am-7-7 Baking Co., Ltd.*, 929 F.2d 276, 280 (6th Cir.1991). Where the Michigan Supreme Court has not addressed the issue, the Court must ascertain from all available data, including decisional law from the state's lower courts, what the supreme court would decide if faced with the issue. *Id.* "Although a decision by a lower state court is not necessarily controlling where the highest state court has not yet spoken, the opinion of an intermediate appellate state court is not to be disregarded unless the federal court is convinced by other persuasive data that the highest state court would decide otherwise." *Id.* at pp. 280–281.

While the *Neibarger* decision does not address the specific issue now before this Court, it clarifies the scope of the economic loss doctrine in Michigan. *Neibarger* implicitly recognizes that the doctrine does not necessarily bar all tort recovery by the buyer of a defective product. However, the court was concerned that unwarranted construction of the doctrine would "blur the distinction between tort and contract" and "undermine the purpose of the Legislature in adopting the UCC." See *Neibarger*, 439 Mich. at pp. 527–28, 486 N.W.2d 612. *Neibarger* specifically holds that "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC." *Id.*, at pp. 527–28, 486 N.W.2d 612. Excepted from "economic loss" are only those losses resultant from damage to other property caused by the defective product in a manner which was beyond the contractual contemplation of the parties. Considering the *Neibarger* court's concern with maintaining the integrity of the UCC, and of its purposes, it appears unlikely that the supreme court would expand this exception to permit recovery in tort for damage done to the product itself, even though such damage be inflicted in a manner beyond the parties' contemplation and even though other property was also damaged.

This reading of *Neibarger* appears to be consistent with rulings of the Michigan Court of Appeals. In *Great American Ins. Co. v. Paty's Inc.*, 154 Mich.App. 634, 397 N.W.2d 853 (1986), a diesel combine was damaged by fire due to a hydraulic line defect. No other injury to person or property was alleged. The economic loss doctrine was held to bar recovery in tort for damage to the combine even though the damage was sudden and calamitous and ostensibly of a nature not within the contractual contemplation of the parties.

In *Sullivan Industries, Inc. v. Double Seal Glass Co., Inc.*, 192 Mich.App. 333, 480 N.W.2d 623 (1991), a defective window sealant caused damage to window units. Recovery for the loss of the window units was held barred. No sudden and calamitous accident was involved, but the *Sulli-*

---

**3.** For present purposes, the peanut conveyor roaster and conveyor cleaner are treated as two integrated components of the same product. Both components were sold in the same transac-tion under the same sales agreement, and both components are treated as one "product" in the allegations of the complaint.

*van* decision nonetheless is instructive. In an action by the manufacturer of the window units against the supplier of the sealant, the window units were deemed to constitute not "other property," but the same product, subject of the same sales transaction, of which the sealant was an integral component. Thus, in a commercial setting, the court of appeals viewed "the product" broadly, not narrowly, and ruled that the economic loss doctrine barred recovery in tort for damage to the product.

Further, it is noteworthy that both the *Great American Ins.* and *Sullivan* opinions include quotation of Dean Keeton's recommendation, *supra* at p. 139, that a distinction be drawn between dangerous conditions that harm only the product, actionable in contract, and those that harm persons or other property, actionable in tort. *Neibarger* cites both opinions with approval. This distinction was observed as well in *Consumers Power Co. v. Mississippi Valley Structural Steel Co.*, 636 F.Supp. 1100 (E.D.Mich.1986), where the court quoted the following analysis of the United States Supreme Court:

> ... When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.

> The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured....

> Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified.

636 F.Supp. at 1112, quoting from *East River Steamship Corp. v. Transamerica Delaval*, 476 U.S. 858, 871–72, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986). See also *Sylla v. Massey–Ferguson, Inc.*, 660 F.Supp. 1044, 1047–48 (E.D.Mich.1984); and *Nat'l Union Fire Ins. Co. v. Pratt & Whitney Canada, Inc.*, 107 Nev. 535, 815 P.2d 601, 603–605 (1991), (containing an excellent discussion of this issue).

Extending this distinction, consistently employed in the Michigan case law, to its logical conclusion, the Court believes the Michigan Supreme Court, if faced with the instant facts, would hold the economic loss doctrine bars recovery in tort for losses caused by fire damage to the peanut roaster and conveyor cleaner. The UCC and insurance coverage provide the appropriate and adequate remedies for such losses arising out of this commercial transaction. Thus, defendant is entitled to summary judgment with respect to tort claims for losses resultant from damage to the peanut roaster and the conveyor cleaner. The economic loss doctrine, however, does not bar Citizens' tort claims for losses resultant from fire damage to other property.

## VI. CONSEQUENTIAL DAMAGES EXCLUSION

Defendant contends that claims not barred by the economic loss doctrine are effectively barred by the exclusion of damages provision in the sales agreement, page 13, ¶ 2(f):

> EXCLUSION OF DAMAGES. THE COMPANY SHALL NOT BE LIABLE FOR PROXIMATE INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES, INCLUDING BUT NOT LIMITED TO ERECTING EXPENSES AND DAMAGES FOR LOSS OF PROFITS OR PRODUCTION OR INJURY TO PERSON OR PROPERTY.

Defendant contends losses resultant from damages to property other than the peanut roaster and conveyor cleaner are properly characterized as consequential damages, damages for loss of profits and damages for injury to property, damages for which it has expressly disclaimed liability. Citi-

zens argues that contractual disclaimer of tort liability can be effected, if at all, only by a provision clearly and unequivocally expressing such intent. *American Empire Ins., supra.*

■ Attesting to the validity and effectiveness of the exclusion provision, defendant contends, is *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 358 F.Supp. 449, 465 (E.D.Mich.1972), *aff'd* 509 F.2d 1043 (6th Cir.1975), which upheld a nearly identical provision. In *U.S. Fibres,* the district court observed that parties may agree to preclude recovery for losses resulting from negligence. In affirming, the Sixth Circuit Court recognized that the UCC permits exclusion of consequential damages so long as it is not unconscionable. M.C.L. § 440.-2719(3). The *U.S. Fibres* ruling was relied on in *Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274, 278 (4th Cir.1987), as the Fourth Circuit Court surveyed Michigan law and concluded that an exclusion of consequential damages can be effective with respect to both tort and contract remedies and should be construed in accordance with its plain. meaning. The Sixth Circuit reached the same conclusion in *Frey Dairy v. A.O. Smith Harvestore Products, Inc.,* 886 F.2d 128 (6th Cir.1989), finding it unnecessary to even consider application of the economic loss doctrine where the parties had by contract clearly waived all remedies but the expressly agreed to remedy.

The Court finds the instant exclusion of damages provision no less clear and unequivocal than those upheld in the cited cases. The parties to the sales agreement, in capitalized, boldface print, expressly agreed that Proctor & Schwartz would not be liable for proximate, incidental, consequential or other damages in the nature of loss of profits or production or injury to property. The Court agrees with defendant that its liability for all of the claimed losses arising out of damage to property other than the peanut roaster and conveyor cleaner was effectively excluded by this provision.

■ Citizens protests, asserting that enforcement of the exclusion of damages provision would be unconscionable. Unconscionability is a question of law for the Court to decide. *Northwest Acceptance Corp. v. Almont Gravel, Inc.,* 162 Mich. App. 294, 300, 412 N.W.2d 719 (1987). The issue should be determined based on the facts and circumstances extant at the time of the making of the contract, not as of the time of suit. *Id.* Unconscionability rarely is found to exist in a commercial setting. *U.S. Fibres, supra,* 509 F.2d at 1048; *WXON–TV, Inc. v. A.C. Nielsen Co.,* 740 F.Supp. 1261, 1264 (E.D.Mich.1990); *Johnson v. Mobile Oil Corp.,* 415 F.Supp. 264, 266 (E.D.Mich.1976). However, where the remedy prescribed in a limitation of liability clause is necessarily illusory, failing of its essential purpose, the clause may be held unconscionable. *Latimer v. William Mueller & Son, Inc.,* 149 Mich.App. 620, 637, 386 N.W.2d 618 (1986).

■ Citizens asks the Court to evaluate the question of unconscionability under the standards set forth in *Johnson, supra,* 415 F.Supp. at 268:

> The various factors considered by the courts in deciding questions of unconscionability have been divided by the commentators into "procedural" and "substantive" categories. See J. White & R. Summers, [*Uniform Commercial Code,* § 12–11], *supra,* at 118–30. Under the "procedural" rubric come those factors bearing upon what in the *Weaver [v. American Oil Co.,* 257 Ind. 458, 276 N.E.2d 144 (Ind.S.Ct.1971)] case was called the "real and voluntary meeting of the minds" of the contracting parties: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question. The "substantive" heading embraces the contractual terms themselves, and requires a determination whether they are commercially reasonable. According to J. White & R. Summers, *supra,* at 128:

Most courts take a "balancing approach" to the unconscionability question, and to tip the scales in favor of unconscionability, most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability.

Citizens recognizes, as does *Johnson*, that an exclusion of consequential damages is not prima facie unconscionable in a commercial setting. M.C.L. § 440.2719(3). It follows that a determination of unconscionability cannot be made with respect to the subject provision based on its "substantive" content alone, but must be premised upon the "procedural" factors. *Id.*

■ In this regard, Citizens argues that defendant has the burden of proving that the exclusion of damages clause is not unconscionable, citing *Weaver v. America Oil Co.*, 257 Ind. 458, 276 N.E.2d 144, 148 (1971), quoted in *Johnson*, 415 F.Supp. at 266. Yet, a careful reading of *Weaver* reveals that the party seeking to enforce the contract would have the burden of showing that the provisions were explained to the other party and there was a real and voluntary meeting of the minds only if the contract were first shown to be prima facie unconscionable. Here, as noted, the subject clause is not prima facie unconscionable as a matter of law. M.C.L. § 440.-2719(3). It is, therefore, Citizens' responsibility to come forward with at least a prima facie showing of unconscionability which defendant would be obliged to rebut. This understanding is consistent with the general rule: "Except in cases in which consumer goods cause personal injuries, the buyer carries the burden of proving the unconscionability of the limitation-of-remedy clause." J. White and R. Summers, 1 *Uniform Commercial Code*, 3rd ed., § 12–11, p. 607.

■ In support of this showing, Citizens presents the affidavit of A. Scott Koeze, President and owner of Koeze Company. Mr. Koeze signed the subject 15–page sales agreement immediately beneath the following language:

The undersigned affirms that he has read and understands all the terms and conditions of this Proposal–Contract including Paragraph 2 entitled "WARRANTIES AND LIABILITY OF COMPANY" and has executed this Proposal–Contract intending to be legally bound by the terms thereof.

He attests that no one from Proctor & Schwartz explained or discussed paragraph 2 of the contract; that he did not have the assistance of counsel at the time of signing; that he did not intend to give up any right to seek damages for injury caused by the defective condition of the product; and that, at the time of signing, the product purchased was to his knowledge the only one of its type and capacity available.

■ All but the last of these elements pertains to Mr. Koeze's understanding of the contract provisions concerning the warranties and liability of Proctor & Schwartz. Though Mr. Koeze explicitly affirmed by executing the contract that he understood these contract provisions, he now refutes that affirmation. It is well-settled under Michigan law that one who signs a contract is presumed to have read, understood and agreed to be bound by its terms and cannot seek to avoid such terms absent a showing of fraud or mutual mistake. *Paterek v. 6600 Limited*, 186 Mich.App. 445, 450, 465 N.W.2d 342 (1990). There is no evidence of fraud or mutual mistake in this case. Nor does Mr. Koeze state or imply that his ability to understand was handicapped by illiteracy or lack of education, intelligence or business acumen and experience. Cf. *Johnson, supra; Aluia v. Harrison Community Hosp. (On Remand)*, 139 Mich. App. 742, 749, 362 N.W.2d 783 (1984).

■ Neither is Mr. Koeze's statement that he was aware of no alternatives to the Proctor & Schwartz product compelling. The availability of alternative products *is* a factor to be considered. The role of this factor was described in *Allen v. Michigan Bell Telephone Co.*, 18 Mich.App. 632, 637–38, 171 N.W.2d 689 (1969):

Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered. Where goods and services can

only be obtained from one source (or several sources on noncompetitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without. Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully extracts agreement to an unreasonable term cannot insist on the courts enforcing it on the ground that it was "freely" entered into, when it was not. He cannot in the name of freedom of contract be heard to insist on enforcement of an unreasonable contract term against one who on any fair appraisal was not free to accept or reject that term.

There are then two inquiries in a case such as this: (1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) Is the challenged term substantively reasonable?

> "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams v. Walter–Thomas Furniture Company* (1965), 121 U.S.App.D.C. 315 (350 F.2d 445, 449, 18 A.L.R.3d 1297).

Thus, merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced. By like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties.

See also *Northwest Acceptance, supra,* 162 Mich.App. at 302–03, 412 N.W.2d 719.

Applying these standards, it is first of all apparent that Mr. Koeze has indicated only that he was unaware, at the time of contracting, of any other available peanut roasters of the same type and capacity. He has not described the extent of his search for an alternative. Nor has he explained the nature of any disadvantage Koeze Company would have experienced had it purchased a peanut roaster of a different type or capacity. Yet, even if the lack of desirable options were deemed to place the parties in wholly unequal bargaining positions, the exclusion of damages clause would not, under *Allen,* be found unconscionable, because it is not substantively unreasonable on its face. "If the term is substantively reasonable it will be enforced." *Id.*

As indicated *supra,* unconscionability is rarely found to exist in a commercial setting. Citizens has failed to show that this case presents the requisite extraordinary circumstances. The subject exclusion of damages clause is a conspicuous and unambiguous part of a sales transaction between two commercial entities. Viewed in light of the circumstances extant at the time of contracting, it does not appear to be so unreasonable or oppressive as to render it unconscionable and unenforceable.

It follows that the exclusion of damages clause is valid and effective. It precludes recovery in damages for losses resultant from fire damage to property other than the peanut roaster and conveyor cleaner, and defendant is therefore entitled to summary judgment with respect to tort claims premised upon such losses.

## VII. CONCLUSION

In sum, the Court concludes there is no genuine issue of material fact and defendant's motion for summary judgment should be granted in total. To the extent the second amended complaint sets forth claims for breach of express warranty, they are barred by the contractual period of limitation. Claims for breach of the implied warranties of merchantability and fitness are precluded because such warranties were effectively disclaimed by defendant Proctor & Schwartz in the sales agreement. Tort claims for breach of implied warranty and negligence, to the extent

they seek recovery of losses caused by fire damage to the product itself, the peanut roaster and conveyor cleaner, are barred by the economic loss doctrine. Tort claims premised upon losses caused by fire damage to property other than the product itself are precluded by defendant's contractual exclusion of liability for consequential damages.